# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re                                              Case No. 13-80166-WRS
                                                   Chapter 13
MATHIS RICHARDSON
LILLIAN RICHARDSON,

      Debtors

MATHIS RICHARDSON and
LILLIAN RICHARDSON,

      Plaintiffs                        Adv. Pro. No. 15-8008-WRS

   v.

PNC MORTGAGE,

      Defendant

## <u>MEMORANDUM DECISION</u>

This adversary proceeding is before the Court on Defendant PNC Mortgage, N.A.'s motion to dismiss the amended complaint filed by Plaintiffs Mathis and Lillian Richardson. (Doc. 23).  The Plaintiffs object to the Defendant's claim in their underlying bankruptcy, and have asserted claims for breach of contract, fraud, and violations of the Real Estate Settlement Procedures Act.  For the reasons set forth below, the Plaintiff's objection to the Defendant's claim is OVERRULED.  The Defendant's motion to dismiss is GRANTED in part and DENIED in part.

# I. FACTS & PROCEDURAL HISTORY

## A. The Note

On April 7, 2000, Plaintiffs Mathis and Lillian Richardson ("the Richardsons") obtained a $46,000 loan from Alabama Exchange Bank in return for a promissory note and mortgage on their home (collectively "the Note"). The Note called for a monthly payment of $440 for five years, amortized on a twenty year schedule at 9.75%. At the end of sixty months, the Note called for a balloon payment of the remaining mortgage balance.

On May 9, 2005, the Richardsons and Alabama Exchange Bank renewed the Note in the amount of $41,700.20, with the same monthly payments ($440) but with a lower interest rate of 7% amortized over the remaining fifteen years on the Note.[1] Alabama Exchange Bank waived the May 2005 balloon payment and scheduled another balloon payment for May 2010.

Starting in August 2005, the Richardsons began paying $620 per month on the Note.[2] This meant that they were now paying roughly $245 extra per month toward the Note's principal. *Supra* note 1. Some time after August 2005, Alabama Exchange Bank assigned the Note to RBC Bank ("RBC").

---

[1] The typical monthly payment for a $41,700 loan amortized over fifteen years at 7% would be $375. Therefore, by continuing their monthly payments of $440 on the Note, the Richardsons were paying $65 extra per month toward the Note's principal.

[2] In 1999, the Richardsons had given Alabama Exchange Bank another promissory note for an earlier loan of roughly $10,500, and the monthly payment on that note was $176.82, meaning that the Richardsons paid $620 per month on both notes. After the 1999 note matured in July 2005, the Richardsons continued to pay $620 per month and applied the full payment to the 2000 Note.

2

### B. The Inconsistent Statements

On July 6, 2009, RBC mailed the Richardsons a statement that the principal balance on the Note was $24,931.51. On October 5, 2009, RBC mailed the Richardsons another statement that the principal balance on the Note was 19,396.94. On October 18, 2009, RBC mailed the Richardsons a statement that the principal balance on the Note was $18,380.53. However, on November 4, 2009, RBC informed the Richardsons that the Note's principal balance was $22,596.14. According to the amended complaint, the Richardsons had been timely and consistently paying $620 per month on the Note up to this point.

On March 1, 2010, Robert Davis ("Davis"), an employee of RBC, told the Richardsons not to make any more payments until the amount of principal remaining on the Note could be determined. On March 30, 2010, RBC mailed a letter to the Richardsons stating that the principal balance on the Note was $20,376.14. RBC's letter stated that it would take the Richardsons three years to pay the Note off at the rate of $620 per month. The letter made no mention of the May 2010 balloon payment.

On April 5, 2010, Davis again told the Richardsons not to send any more payments until RBC could review their payment history again. On June 25, 2010, Davis told the Richardsons that based on his March 30 letter, the Richardsons would pay the Note off in three years, and told them to resume paying $620 per month on the Note. On July 1, 2010, the Richardsons received a letter from RBC informing them that the Note had matured in May 2010. They called Davis about the letter, and he told them to disregard the letter and continue making their monthly payments. They received a separate letter from RBC the same day notifying them that their June 2010 payment of $440 was due.

3

## C. The Change in Terms Agreement

The Richardsons resumed payments of $620 per month. On November 3, 2010, RBC mailed the Richardsons a letter and a document modifying the Note that was entitled "Change in Terms Agreement" ("CTA"). The CTA indicated that the principal balance on the Note was $19,794.62, and proposed to lower the interest rate to 6.25% amortized over three years. According to the letter accompanying the CTA, it called for required monthly payments of $604.63 and would be paid off at that rate in three years. The CTA's maturation date was October 2013. Davis signed the November 3, 2010 letter. The CTA was typed by RBC and lists RBC as the lender. There are signature lines on the CTA for the Richardsons, but not for RBC. The Richardsons did not sign or return the CTA, but allege they "accepted this offer by performance." (Doc. 22, ¶ 27).

The same day they received the CTA, the Richardsons received a letter from RBC stating that the amount due on the Note as of November 1, 2010 was $440. The Richardsons contacted Davis, who instructed them that the $620 payment they had made on November 2 would suffice. They also raised concerns about the accuracy of the principal balance stated in the CTA, and Davis said he would look into it. The Richardsons paid $604.63 on December 2, 2010, and five days later RBC sent them a statement that the principal balance on the Note was $18,825.16.

RBC mailed the Richardsons a monthly statement on December 30, 2010 indicating that $440 was due. The Richardsons paid $440 on January 4, 2011 and again on January 28, 2011. On February 3, 2011, Davis told them to resume making payments of $620, and the Richardsons did so. On August 18, 2011, RBC told them that the Note's principal balance was $14,677.84.

4

### D. The New Mortgagee

Sometime prior to March 2012, RBC assigned the Note to PNC Mortgage, N.A. ("PNC").
On March 5, 2012, PNC sent a monthly statement to the Richardsons stating that the amount due
that month was $440 and that the principal balance on the Note was $11,079.83. The
Richardsons paid $620 on March 25, 2012, and PNC accepted the payment. The Richardsons
paid another $620 on April 29, 2012.

On May 1, 2012, PNC returned the April payment of $620 to the Richardsons along with
a letter explaining that the money was being returned because the Note had reached its May 2010
maturity date. The Richardsons continued making $620 monthly payments to PNC. On June 12,
2012, PNC returned $1,240 to the Richardsons and again cited the Note's May 2010 maturity
date. One day later, PNC mailed the Richardsons a letter stating that the Note was past due in the
amount of $1,320.

On June 15, 2012, PNC notified the Richardsons that the Note had been referred to
counsel for foreclosure. The Richardsons continued to pay $620 per month, and on October 24,
2012, PNC returned $1,240 to them. On October 30, 2012, PNC sent the Richardsons a "Notice
of Acceleration of Promissory Note and Mortgage," and indicated that the principal balance on
the Note was $12,466.93. The foreclosure sale was scheduled for February 8, 2013.

### E. The Bankruptcy

Unable to come to terms with PNC, the Richardsons filed Chapter 13 bankruptcy on
February 6, 2013. (Case No. 13-80166). On their Schedule D and in their various Chapter 13
plans, the Richardsons listed the amount owed to PNC as $12,253.40. (Case No. 13-80166,
Docs. 17, 20, 22, 28, 31, 37). PNC filed a proof of claim on August 27, 2013 for $15,181.91, all

of which was secured; the claim stated that $8,930.52 was for arrearage.  (Case No. 13-80166, Claim 12).  The Richardsons did not object and amended their plan again on October 8, 2013, listing their debt to PNC as $15,181.91.  (Case No. 13-80166, Doc. 44).  The Court confirmed the October 8 plan on October 20, 2013.  (Case No. 13-80166, Doc. 47).

### F.  The Qualified Written Request

On November 26, 2014, the Richardsons mailed PNC a Qualified Written Request that PNC received on December 1, 2014 and acknowledged the following day.  PNC responded on January 8, 2015 that it did not have sufficient time to respond, but that a response would be forthcoming on February 4, 2015.  PNC responded to the Qualified Written Request on January 29, 2015.

### G.  The Adversary Proceeding

The Richardsons initiated this adversary proceeding on February 2, 2015, suing PNCin a nine-count complaint.  (Doc. 1).  In response to PNC's initial motion to dismiss (Doc. 15), the Richardsons amended their complaint and dropped some of their claims.  (Doc. 22).

The Richardsons' amended complaint asserts five claims against PNC: misrepresentation (Count I), suppression of material facts (Count II), breach of contract (Count III), objection to PNC's proof of claim in their bankruptcy (Count IV), and violations of the Real Estate Settlement Procedures Act ("RESPA") (Count V).  (Doc. 22).  The Richardsons allege that PNC improperly charged late fees for payments that were timely received, misapplied payments, miscalculated the amount owed by them, and improperly charged unidentified and unauthorized fees.  They attached twenty-four exhibits in support of their amended complaint.

## H. The Arguments

PNC has moved to dismiss the amended complaint. (Doc. 23). PNC primarily argues that the Richardsons' claims are barred by Alabama's statute of frauds because the Richardsons never signed or returned the CTA that RBC sent them. PNC also argues that the misrepresentation and suppression claims were not alleged with particularity. PNC argues that the Richarsons' objection to its proof of claim is barred by res judicata. Finally, PNC argues that the Richardsons failed to state a RESPA claim because it timely and adequately responded to their Qualified Written Request.

The Richardsons filed a response in opposition to PNC's motion. (Doc. 26). They argue that they made extra payments to get seven years ahead on the Note's amortization and continued making monthly payments at the instruction of RBC, even though RBC could not accurately calculate the Note's principal balance. They argue RBC's letters sent on March 30, 2010, and on November 3, 2010 (the CTA) satisfy Alabama's statute of frauds, even though they did not sign the CTA. They also argue that RBC and PNC waived their right to foreclose on the basis of the Note's balloon payment that was scheduled for May 2010 by accepting payments afterward and are equitably estopped from enforcing it now. They argue that they have pled misrepresentation and suppression with sufficient particularity, and that a contract was formed by the CTA. They argue their objection to PNC's claim is not barred by res judicata because of Local Bankruptcy Rule 3015-4. Finally, they argue PNC did not timely respond to the Qualified Written Request.

PNC has filed a reply. (Doc. 27). It argues that the misrepresentation and suppression claims should be dismissed because the Richardsons failed to adequately plead detrimental reliance. It also argues that the Richarsons are barred from asserting their equitable estoppel

argument because they, and not PNC, caused the confusion regarding the Note.  PNC argues that

the Richardsons misinterpret Local Bankruptcy Rule 3015-4.  Finally, PNC reiterates that the

Richardsons failed to state a claim under RESPA.


## II.  JURISDICTION & ADJUDICATORY POWER

The Richardsons' objection to claim is "arising in . . . [a] case[] under title 11" and the

Court has jurisdiction pursuant to 28 U.S.C. § 1334(b).  *See* Miller v. Kemira, Inc. (In re Lemco

Gypsum, Inc.), 910 F.2d 784, 788 (11th Cir. 1990).  The Richardsons' remaining claims are

"related to [a] case[] under title 11" so the Court likewise has jurisdiction over them pursuant to

28 U.S.C. § 1334(b).  Id.  Venue is proper under 28 U.S.C. § 1409(a).  Except for Count IV, this

is a non-core proceeding.  This is an interlocutory order.


## III.  STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure (as incorporated by FED. R.

BANKR. P. 7012(b)), authorizes the Court to dismiss complaints that fail to "state a claim upon

which relief can be granted."  The Court's analysis of a complaint in the context of a motion to

dismiss is a two-step process.  First, the Court must identify, and cull, pleadings that are mere

legal conclusions or "[t]hreadbare recitals of the elements of a cause of action," for such

pleadings "are not entitled to the assumption of truth."  Ashcroft v. Iqbal, 556 U.S. 662, 678-79

(2009).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their

veracity and then determine whether they plausibly give rise to an entitlement to relief."  Id. at

679.

8

"[S]tating such a claim requires a complaint with enough factual matter (taken as true)"

"to raise a right to relief above the speculative level," *i.e.*, the complaint must be "plausible on its

face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 570 (2007). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "The

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." Id. A "well-pleaded complaint may proceed

even if it strikes a savvy judge that the actual proof of those facts is improbable, and 'that a

recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556.

The Court will address PNC's res judicata argument in Part IV. It will address the

Richardsons' waiver argument in Part V and PNC's statute of frauds argument in Part VI. The

Court will consider the adequacy of the Richardsons' fraud claims in Part VII and will address

the Richardsons' RESPA claim in Part VIII. The Court will summarize the disposition of PNC's

motion to dismiss in Part IX.


## IV. RES JUDICATA BASED ON PLAN CONFIRMATION (COUNT IV)

PNC argues that Count IV of the Richardsons' complaint, their objection to PNC's claim,

is barred by the res judicata effect of plan confirmation. "The provisions of a confirmed plan

bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the

plan, and whether or not such creditor has objected to, has accepted, or rejected the plan." 11

U.S.C. § 1327(a). Based on this language, courts have considered an order confirming a Chapter

13 plan to be a final judgment on the merits with preclusive effect. *See, e.g.*, Universal Am. Mortg. Co. v. Bateman (In re Bateman), 331 F.3d 821, 829 (11th Cir. 2003); *cf.* United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 269 (2010) (denying Rule 60 relief to creditor whose claim for student loan debt was improperly discharged by a confirmed Chapter 13 plan); Hope v. Acorn Fin., Inc., 731 F.3d 1189, 1194-95 (11th Cir. 2013) (holding that a trustee's preference action to avoid an unperfected security interest was barred by plan confirmation when she was aware of the defect pre-petition). "To demonstrate that res judicata applies, the party asserting the bar must prove that (1) there was a prior judgment on the merits, (2) entered by a court of competent jurisdiction, (3) with substantial identity of the parties or their privies, (4) involving the same cause of action." Baldwin v. Citigroup, Inc. (In re Baldwin), 307 B.R. 251, 260 (M.D. Ala. 2004).

The Eleventh Circuit in Bateman addressed the effect of plan confirmation on the debtor's post-confirmation challenge to a secured creditor's proof of claim for a higher amount than was provided for in the plan. Bateman, 331 F.3d at 823. The court explained that although § 502(a) of the Bankruptcy Code "does not provide for a time limit to file an objection, it must be filed *prior* to plan confirmation." Id. at 827 (emphasis in original). Moreover, "a secured creditor's lien survives a contrary plan confirmation." Id. at 830. "[I]f a lien on a mortgage survives the § 1327 *res judicata* effect of a confirmed plan, then so must any corresponding arrearage claim[.]" Id. at 831 (citing In re Hobdy, 130 B.R. 318, 322 (9th Cir. BAP 1991)). Thus, the Eleventh Circuit held that the debtor in Bateman was barred from objecting to the proof of

10

claim, although the secured creditor would only be paid out of the bankruptcy estate the amount provided for by the plan.[3] Id. at 833.

The holding in Bateman compels the Court to overrule the Richardsons' objection to PNC's claim. Although PNC did not timely file its proof of claim, it was nonetheless filed almost two months before the Court confirmed the Richardsons' plan.[4] Based on their amended complaint, the Richardsons should have been well aware of a potential discrepancy on the Note's principal balance and could have easily noticed that the amount of PNC's proof of claim exceeded the amount originally provided for in their plans. Supra Part I, E. Not only did they not object to PNC's claim at that time, they actually amended their plan to make it conform with PNC's claim.

In their response to the instant motion, the Richardsons argue that PNC failed to take into account the Court's Local Bankruptcy Rule 3015-4 which, according to the Richardsons, compels a different result.[5] The Richardsons' argument fails for two reasons. First, the Local

---

[3] The Eleventh Circuit also explained that because the debtor in Bateman did not timely object to the proof of claim, that represented the correct amount and the debtor's plan failed to comply with § 1325(a) of the Bankruptcy Code because it neither surrendered the collateral, provided for full payment (as provided by the claim), nor obtained the creditor's acceptance of the plan (because a failure to object to the plan does not constitute acceptance when the creditor has filed a contrary proof of claim). Bateman, 331 F.3d at 829. Nevertheless, the court held that res judicata also barred the creditor's post-confirmation attack on the plan. Id. at 830.

[4] A proof of claim must be filed within 90 days after the first date for the meeting of creditors is set pursuant to § 341(a) of the Bankruptcy Code. FED. R. BANKR. P. 3002(c). The deadline to file proofs of claim was June 10, 2013 – two months before PNC filed its proof of claim. Of course, as a secured creditor, PNC could still keep its lien without needing to file a proof of claim at all. See Bateman, 331 F.3d at 828.

[5] The Local Rule states in relevant part: "The 'amount of debt' or 'amount of arrearage' listed by the debtor in the chapter 13 plan is solely an estimate, and confirmation of the plan will

11

Rule's non-binding-effect-of-confirmation provision applies to the amount of debt listed in the *debtor's plan*. It does not purport to provide that confirmation will not be binding as to the amount of debt listed in an allowed claim. Second, even if the Local Rule did provide that a confirmed plan was not preclusive as to the amount listed in an allowed claim, such a provision would directly conflict with <u>Bateman</u>, and this Court's Local Rules must yield to a contrary binding opinion from the Eleventh Circuit.

Pursuant to § 1327(a) and <u>Bateman</u>, the Court's confirmation of the Richardsons' plan was a final judgment on the amount to which PNC was entitled to be distributed in the bankruptcy. The Court clearly had jurisdiction to confirm the Richardsons' plan, and the same parties are involved. The Court must overrule the Richardsons' objection to PNC's proof of claim.

## V. WAIVER OF STRICT PERFORMANCE

The Richardsons argue in their response to PNC's motion to dismiss that RBC and PNC waived their right to enforce the Note's balloon payment that was scheduled for May 2010. (Doc. 26, p. 7-9). Because this argument, if valid, would foreclose PNC's statute of frauds argument, the Court addresses it first. The parties agree that Alabama law applies.

"Waiver is defined as the voluntary surrender or relinquishment of some known right, benefit, or advantage. However, it is well established that a party's intention to waive a right is

---

not have a binding effect on these amounts. The allowed claim will control the 'amount of debt' or the 'amount of arrearage.'" LBR 3015-4(b).

to be established from the external acts manifesting the waiver.  This intention to waive a right

may be found where one's course of conduct indicates the same or is inconsistent with any other

intention."  Hughes v. Mitchell Co., 49 So. 3d 192, 201-02 (Ala. 2010) (internal quotation marks

and citations omitted).  "Where there has been a material breach of a contract, the injured party

has an election either of continuing performance of the contract, or of repudiating the contract.

Any act by the injured party, after breach, which shows that the contract is deemed in existence,

amounts to a waiver of the breach."  Roan v. Johnson, 84 So. 2d 379, 381 (Ala. Civ. App. 1955).

     The parties have not cited any cases specifically addressing waiver of strict performance

in the context of balloon payments, and the Court has found none on its own.  However, in the

closely-related context of installment land sale forfeitures, vendors waive their right to enforce a

forfeiture clause "by accepting something less than strict performance."  Green v. Hemmert, 703

So. 2d 391, 396 (Ala. Civ. App. 1997); *see also* Lowery v. Peterson, 75 Ala. 109, 111-12 (1883)

(analogizing an installment land sale contract to a mortgage).  For example, in Zirkle v. Ball, a

vendor was unable to enforce a forfeiture provision after accepting partial payments from the

vendee long after the maturation date for the contract had passed; the vendor had waived his right

to demand strict performance.  Zirkle v. Ball, 54 So. 1000, 1001 (Ala. 1911).  Likewise, in

Lowery, the court noted that the vendor had waived his right to declare a forfeiture when he

accepted partial payment.  Lowery, 75 Ala. at 113.  That said, "mere acceptance of payments *in*

*default* under a lease-sale contract does not waive *future* defaults of the same nature."  Hamner v.

Rock Mountain Lake, Inc., 451 So. 2d 249, 251-52 (Ala. 1984) (emphasis in original).

Here, the Richardsons' amended complaint alleges that RBC, through its employee Davis, told them not to worry about the Note's May 2010 balloon payment. *Supra* Part I, B. The Richardsons allege that RBC continued to accept payments that were less than the full amount of the principal balance through at least August 2011 and possibly until March 2012. *Supra* Part I, C. They allege that the only payments they missed during this period were when Davis instructed them to stop making payments. Based on the Richardsons' amended complaint, there is no default in the Note on the part of the Richardsons. The Court has no difficulty concluding from these facts that RBC waived its right to enforce the Note's balloon payment.

The cases cited by PNC, dealing with non-waiver of acceleration clauses, are inapposite to whether the balloon payment was waived because an acceleration clause can be triggered by a default in any monthly payment. A balloon payment, by comparison, is a one-time obligation scheduled for a specific date. Once waived, it is not revived by the debtor's obligation to make subsequent monthly payments. PNC, as RBC's assignee, has "the same rights, benefits, and remedies" that RBC possessed under the Note, such that it "simply step[ped] into the shoes" of RBC. Atl. Nat'l Trust, LLC v. McNamee, 984 So. 2d 375, 378 (Ala. 2007) (internal quotation marks omitted); *see also* Ware v. Russell, 70 Ala. 174, 181 (1881) ("the assignor could transfer no higher or greater right than he possessed"). Since RBC waived its right to enforce the balloon payment and could no longer enforce it, RBC could not transfer any right to enforce the balloon payment to PNC. Therefore, PNC was not entitled to enforce the balloon payment in the Note.

## VI.  STATUTE OF FRAUDS

PNC's primary argument for dismissing Counts I, II, and III is that it is not bound by the Change in Terms Agreement ("CTA") because the CTA does not satisfy Alabama's statute of frauds.  The Court's determination that RBC waived its right to enforce the balloon payment, and that its waiver is binding on PNC, obviates PNC's statute of frauds argument because even if the CTA is unenforceable, PNC is still bound to accept payments under the original Note.  However, the Court is mindful that it currently must take all facts pled in the amended complaint to be true, and there is a possibility that the evidence will not substantiate those allegations.  If the evidence shows that the balloon payment was not waived and is enforceable pursuant to the Note, the validity of the CTA will determine whether PNC can enforce the balloon payment, and whether the Richardsons will be successful in their contract and fraud claims.  In light of the current procedural posture, the Court will address the legal merits of PNC's statute of frauds argument.

Although statute of frauds is typically raised as a defense to breach of contract, "where, as here, an element of a tort claim turns on the existence of an alleged agreement that cannot, consistent with the Statute of Frauds, be proved to support a breach-of-contract claim, the Statute of Frauds also bars proof of that agreement to support the tort claim."  Holman v. Childersburg Bancorporation, Inc., 852 So. 2d 691, 701 (Ala. 2002).

Under Alabama's statute of frauds, certain types of contracts are void unless they "express[] the consideration . . . in writing and [are] subscribed by the party to be charged therewith[.]" ALA. CODE § 8-9-2.  Thus for a contract to be void due to the statute of frauds it must be a type of contract enumerated in § 8-9-2 and either (i) there must not be a writing that

15

sufficiently expresses the consideration and terms of the contract, or (ii) whatever writing there is must not be "subscribed by the party to be charged[.]"

## A. Types of Contracts to which the Statute of Frauds Applies

"[A] transaction is covered by the Statute of Frauds if it comes within *any* of the subsections of § 8-9-2." Page v. Gulf Coast Motors, 903 So. 2d 148, 151 (Ala. Civ. App. 2004) (emphasis in original). PNC asserts that there are two categories of contracts, to which the statute of frauds applies, that the CTA falls within. They are:

> (3) Every special promise to answer for the debt, default or miscarriage of another; [and]
>
> (7) Every agreement or commitment to lend money, delay or forebear [sic] repayment thereof or to modify the provisions of such an agreement or commitment *except for consumer loans with a principal amount financed less than $25,000*[.]

ALA. CODE § 8-9-2(3) and (7) (emphasis added).

It is immediately clear that § 8-9-2(3) is inapplicable. That subsection is the category for surety contracts, and the CTA is plainly not such an agreement. The CTA did not ask the Richardsons to guarantee repayment of anyone else's debt because the Richardsons themselves received the loan. The CTA contains some boilerplate language that refers to a "guarantor," but has no actual guarantor.

PNC's assertion of § 8-9-2(7), dealing with option contracts to take loans or delay repayment, fares no better. Although the CTA is an agreement to "delay or forbear repayment"

16

of a loan,[6] it falls within the exception for consumer loans under $25,000.  A consumer loan is "one in which the party to whom credit is extended is a natural person and the money, property, or services which are the subject of the transaction are primarily for personal, family or household purposes."  ALA. CODE § 5-19-1(2).  The CTA's stated principal is $19,794.62 and it was a consumer loan since the Richardsons are "natural" people and are using the money to buy a house.  The CTA does not fall within the ambit of § 8-9-2(7), and is not the type of contract to which the statute of frauds applies.

### B.  Writing Subscribed by the Party to be Charged

Even if the CTA is such a contract, however, the statute of frauds is still inapplicable. The CTA is a written document that clearly states the parties in question, the amount of principal allegedly owed, the amount and number of the required monthly payments, and the interest to be charged on the principal.  Furthermore, the CTA was "subscribed" by the assignor of the party to be charged, RBC, and PNC as the assignee is bound by that.

"To *subscribe*, is to be, 'to set one's hand to a writing[.]'" Riley v. Riley, 36 Ala. 496, 502 (1860) (quoting Pridgen v. Pridgen's Heirs, 35 N.C. 259, 260 (1852) (noting that a testator of a will sufficiently subscribes it by "making his mark")).  Along with the CTA, RBC mailed the Richardsons a letter containing RBC's letterhead that clearly discusses the terms of the CTA and that is signed by Davis, RBC's employee.  The CTA itself was obviously written by RBC and

---

[6] Context is important for this characterization.  If PNC were attempting to enforce the CTA against the Richardsons, it would be more properly characterized as a modification of an agreement to repay money already lent and would not be subject to the statute of frauds.  Rozell v. Childers, 888 So. 2d 1244, 1247 (Ala. Civ. App. 2004).

clearly references the Note, which was signed by RBC's assignor, Alabama Exchange Bank. Finally, although the CTA was not signed by RBC, the signature of RBC was not intended to be required to make the contract enforceable because there is no signature block on which RBC was to sign. *Cf.* Bunch v. Garner, 94 So. 114, 115 (Ala. 1922) (holding that enforcement of an unsigned contract was barred by the statute of frauds, even though the body of the contract contained the parties' names, because the contract contained signature lines for each of the parties that were left blank); Conoly v. Harrell, 62 So. 511, 512 (Ala. 1913) (same). Thus, the CTA is a writing subscribed by RBC as required by § 8-9-2.

PNC argues that the statute of frauds renders the CTA unenforceable because the Richardsons did not sign the agreement. However, "it is well settled, that the agreement . . . need not be signed [or] subscribed by both parties, but only by him who is to be charged with it[,] and if subscribed by him, that he is estopped from denying the execution or validity of the instrument because it is wanting in the signature of the other party." Heflin v. Milton, 69 Ala. 354, 358 (1881). In other words, it is irrelevant under the statute of frauds that the Richardsons did not sign the CTA because they are not the party to be charged with the agreement; hence, they are allowed to enforce it.

### C. Adequacy of the Breach of Contract Claim (Count III)

"In the ordinary breach of contract action, the claimant must prove: (1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." S. Med. Health Sys., Inc. v. Vaughn, 669 So. 2d 98, 99 (Ala. 1995). Based on the amended complaint, the Richardsons have provided

18

proof of both the Note and CTA, and they have performed under the Note (aside from missing the balloon payment, which RBC's waiver cured). PNC's refusal to accept the Richardsons' monthly payments was in violation of its obligations under either the Note or the CTA; at this stage, it does not matter which. Finally, the Richardsons have adequately stated a claim for damages based on inaccurate and inflated statements of principal owed and the necessity of filing bankruptcy to stave off foreclosure. The Richardsons have stated a claim against PNC for breach of contract, and the Court will deny PNC's motion to dismiss as to Count III.

## VII. ADEQUACY OF THE FRAUD CLAIMS

In addition to its statute of frauds argument, PNC argues that the Richardsons failed to plead their misrepresentation and suppression claims (Counts I and II) with particularity. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b) (as incorporated by FED. R. BANKR. P. 7009).

"To satisfy Rule 9(b)'s 'particularity' standard, a complaint must "identify (1) the precise statements, documents or misrepresentations made; (2) the time and place of the persons responsible for the statement; (3) the content and manner in which the statements misled the plaintiff; and (4) what the Defendants [gain] by the alleged fraud." W. Coast Roofing & Waterproofing, Inc. v. Johns Manville, Inc., 287 Fed. Appx. 81, 86 (11th Cir. 2008) (citing Ambrosia Coal & Constr. Co. v. Pages Morales, 482 F.3d 1309, 1316-17 (11th Cir. 2007) (listing the requirements to plead a civil RICO claim with particularity)). "Furthermore, Rule 9(b)

19

requires more than conclusory allegations that certain statements were fraudulent; it requires that a complaint plead facts giving rise to an inference of fraud." Id.

### A. Claim for Misrepresentation (Count I)

"Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the other party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud." ALA. CODE § 6-5-101. In Alabama, a claim for misrepresentation is alleged by showing (1) a false representation, (2) concerning a material existing fact, (3) that the plaintiff relied upon, and (4) was damaged as a proximate result of the reliance. Billy Barnes Enters., Inc. v. Williams, 982 So. 2d 494, 499 (Ala. 2007).

In their amended complaint, the Richardsons pled facts strongly indicating that RBC misrepresented the amount of principal they owed on the Note in late 2009 and beyond. However, the Richardsons did not name RBC as a defendant. PNC's position as RBC's assignee binds it to RBC's contractual obligations, but does not make it responsible for RBC's tortious conduct. The only facts the Richardsons alleged with regard to PNC are that PNC improperly tried to enforce the balloon payment and that PNC improperly charged late fees and interest. The balloon payment cannot be the basis for the misrepresentation claim because the Richardsons relied on RBC's statements, not PNC's, while the late fee and interest facts have not been pled with sufficient particularity. Nor can the proof of claim PNC filed reasonably be considered a basis for the misrepresentation claim. In short, the Richardsons' misrepresentation claim should be dismissed because they sued the wrong party for it. PNC's motion will be granted as to Count I.

## B. Claim for Suppression of Material Facts (Count II)

"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." ALA. CODE § 6-5-102. "The elements of a cause of action for fraudulent suppression are: (1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; [and] (4) action by the plaintiff to his or her injury." CH America, LLC v. Ligon Capital, LLC, 160 So. 3d 1195, 1201 (Ala. 2013).

Although it is a close call, the Richardsons have stated a claim against PNC for suppression. If PNC fully intended to try to enforce the balloon note, it had a duty to inform the Richardsons of that before it started accepting monthly payments. PNC's concealment induced the Richardsons to continue making payments instead of seeking to refinance, and ultimately forced them into bankruptcy. That is enough to state a claim for suppression. PNC's motion will be denied as to Count II.


## VIII. ADEQUACY OF THE RESPA CLAIM (COUNT V)

Finally, PNC argues that the Richardsons failed to state a RESPA claim because it timely and adequately responded to their Qualified Written Request. PNC also asserts that the Richardsons have failed to allege facts plausibly demonstrating they suffered actual damages. The Richardsons argue that PNC's response was not timely.

The Real Estate Settlement Procedures Act is intended "to insure [sic] that consumers . . . are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by . . . abusive practices. . . ." 12 U.S.C. § 2601(a). "If any servicer[7] of a federally related mortgage loan[8] receives a qualified written request[9] from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A) (footnotes added). The Richardsons concede that PNC received their Qualified

---

[7] "The term 'servicer' means the person responsible for servicing of a loan (including the person who makes or holds a loan if such person also services the loan)[,]" with certain exceptions not applicable here. 12 U.S.C. § 2605(i)(2). "The term 'servicing' means any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan." 12 U.S.C. § 2605(i)(3). There is no dispute that PNC is a "servicer" as defined by § 2605(i)(2).

[8] A "federally related mortgage loan" is "any loan (other than temporary financing such as a construction loan) which . . . is secured by a first or subordinate lien on residential real property (including individual units of condominiums and cooperatives) designed principally for the occupancy of from one to four families, including any such secured loan, the proceeds of which are used to prepay or pay off an existing loan secured by the same property[,] and . . . is made in whole or in party by any lender the deposits or accounts of which are insured by any agency of the Federal Government[.]" 12 U.S.C. § 2602(1)(A) and (B)(i). There is no dispute that the Note is a "federally related mortgage loan" as defined by § 2602(1).

[9] A qualified written request is "a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that . . . includes, or otherwise enables the servicer to identify, the name and account of the borrower[,] and . . . includes a statement of the reasons for the belief of the borrower . . . that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B). There is no dispute that the Richardsons' mailing of November 26, 2014 is a "qualified written request" as defined by § 2605(e)(1)(B).

Written Request on December 1, 2014, and provided written acknowledgment of it the following day. There is no violation of § 2605(e)(1)(A).

"Not later than 30 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request" the servicer must do one of the following:

> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower); [or]
>
> . . . after conducting an investigation, provide the borrower with a written explanation or clarification that includes . . . the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower[, and either]
>
> > (B)(i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; or
> >
> > (C)(i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer[.]

12 U.S.C. § 2605(e)(2).[10]  The servicer can extend the 30-day period in § 2605(e)(2) for 15 days

if, within the 30-day period, "the servicer notifies the borrower of the extension and the reasons

for the delay in responding."  12 U.S.C. § 2605(e)(4).  "Whoever fails to comply with any

provision of [§ 2605] shall be liable to the borrower for each such failure" for, when the

borrower is an individual, "any actual damages to the borrower as a result of the failure[,] and . . .

any additional damages, as the court may allow, in the case of a patter or practice of

noncompliance with the requirements of [§ 2605], in an amount not to exceed $2,000."  12

U.S.C. § 2605(f)(1).

     "'To state a RESPA claim for failure to respond to a written request, a plaintiff must

allege: (1) the defendant is a loan servicer under the statute; (2) the plaintiff sent a qualified

written request consistent with the requirements of the statute; (3) the defendant failed to respond

adequately within the statutorily required days; and (4) the plaintiff has suffered actual or

statutory damages.'" <u>Farson v. Carrington Mortg. Servs., LLC</u>, 2013 WL 5705565, *5 (M.D. Fla.

Oct. 18, 2013) (quoting <u>Correa v. BAC Home Loans Serv. LP</u>, 2012 WL 1176701, *6 (M.D. Fla.

Apr. 9, 2012)).

_____

    [10]  The Richardsons assert in their amended complaint a violation of 12 U.S.C. § 2065(e)(3), which mandates that "a servicer may not provide information regarding any overdue payment, owed by [a] borrower and relating to [a] qualified written request [relating to a dispute regarding the borrower's payments], to any consumer reporting agency" as defined by 15 U.S.C. § 1681a "[d]uring the 60-day period beginning on the date of the servicer's receipt from [the] borrower of [the] qualified written request[.]" Given that the Richardsons were already in bankruptcy when they sent their Qualified Written Request, and considering the context, it is clear that their assertion of § 2605(e)(3) is a typographical error and that the Richardsons intended to allege a violation of 12 U.S.C. § 2605(e)(2) instead.

PNC is clearly a loan servicer as defined by § 2605(i)(2) and the Richardsons sent a qualified written request consistent with § 2605(e)(1)(B) relating to the servicing of the Note. The parties chiefly dispute whether PNC's response was timely. PNC received the Qualified Written Request on December 1, 2014. Excluding weekends, plus Christmas and New Year's Day, PNC's response was due on January 14, 2015 pursuant to § 2605(e)(2). *See* Whittaker v. Wells Fargo Bank, N.A., 2014 WL 5426497, *5 n.16 (M.D. Fla. Oct. 23, 2014) (noting that holidays and weekends must be excluded). However, PNC sent the Richardsons a notice on January 8, 2015 that it was extending the time to respond pursuant to § 2605(e)(4). It is unclear from the statute whether the exclusion of holidays and weekends applies to the 15-day extension as well. If the exclusion applies, PNC had until February 4, 2015 to respond, while if the exclusion does not apply, PNC had to respond by January 29, 2015. Either way, PNC's response date of January 29, 2015 was timely under § 2605(e)(4).

In their Qualified Written Request, the Richardsons asked (1) why their payments were being returned, (2) why PNC refused their insurance settlement, (3) why PNC ignored the Richardsons' calls and communications, (4) why PNC tried to foreclose on their home, and (5) why PNC did not delay the foreclosure. PNC responded that the Note matured in May 2010 and that it sought to enforce the balloon payment, that PNC had no record of any insurance

25

settlement, and that they had no records of communications from the Richardsons.[11]  That is sufficient to respond to a qualified written request under RESPA.

In addition, the Richardsons have failed to adequately allege damages.  Sufficient allegation of "either (1) actual damage . . . or (2) a pattern or practice of nondisclosure by the defendants that would warrant statutory damages . . . is a necessary element of any claim under § 2605."  Frazile v. EMC Mortg. Corp., 382 Fed. Appx. 833, 836 (11th Cir. 2010).  "Numerous courts have read Section 2605 as requiring a showing of pecuniary damages to state a claim. This pleading requirement has the effect of limiting the cause of action to circumstances in which a plaintiff can show that a failure to respond or give notice has caused them [sic] actual harm.  A plaintiff is entitled to recover for the loss that relates to the RESPA violation, not for all losses related to foreclosure activity."  Diunugala v. JP Morgan Chase Bank, ___ F. Supp. 3d ___, 2015 WL 350559, *9 (S.D. Cal. Jan. 21, 2015) (internal quotation marks and citations omitted).

In their amended complaint, the Richardsons merely alleged that PNC "is liable . . . for actual and statutory damages, as well as attorney fees and costs[,]" and "that it is PNC

---

        [11]  The Richardsons did not include PNC's response as an exhibit in their amended complaint; instead, PNC attached it as an exhibit in its motion to dismiss.  "[T]he analysis of a [Rule] 12(b)(6) motion is limited primarily to the face of the complaint and attachments thereto."  Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1368 (11th Cir. 1997).  "However, where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiffs [sic] claims, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment.  Id. at 1368 (citing Venture Assoc. Corp. v. Zenith Data Sys. Corp., 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.")).  Because the Richardsons referred to PNC's response and its alleged inadequacy is necessary for their RESPA claim, the Court can properly consider PNC's exhibit.

Mortgage's pattern and practice not to timely and/or substantively comply with" § 2605. These allegations are mere "[t]hreadbare recitals of the elements of a cause of action" that are "not entitled to the assumption of truth." Iqbal, 556 U.S. at 678-79. To meet the Iqbal standard, the Richardsons had to "allege *facts* showing that there is a patter or practice of noncompliance[,]" not merely that there is noncompliance. Farson, 2013 WL 5705565 at *5 (emphasis added). Nor are the Richardsons' vague references to damages elsewhere in the complaint or their suggestion that PNC's RESPA violation necessitated this litigation sufficient to show damages. The Richardsons had already suffered the damages referred to elsewhere in the amended complaint long before they sent PNC their Qualified Written Request, and they would have needed to sue PNC to rectify those damages anyway.

In short, PNC timely and sufficiently responded to the Richardsons' Qualified Written Request, and the Richardsons suffered no damages from that. The Richardsons have not stated a RESPA claim, so the Court will dismiss Count V.


## IX. CONCLUSION

PNC's motion to dismiss is due to be granted in part and denied in part. The Richardsons' objection to PNC's proof of claim (Count IV) will be overruled because it is barred by res judicata stemming from confirmation of their Chapter 13 plan. Their claim for misrepresentation (Count I) will be dismissed because they have not adequately alleged any misrepresentation on the part of PNC. Finally, their RESPA claim (Count V) will be dismissed because they have not adequately alleged any damages or pattern of noncompliance, and because

27

PNC timely and sufficiently responded to their Qualified Written Request. PNC's motion to dismiss is GRANTED as to Counts I, IV, and V.

PNC's motion will be denied as to the Richardsons' claims of suppression of material facts (Count II) and breach of contract (Count III). The Richardsons adequately pled facts indicating that PNC's predecessor waived its right to enforce the Note's balloon payment, meaning that PNC's later attempted enforcement of the balloon payment was wrongful. PNC's affirmative defense to the CTA based on the statute of frauds fails because the waiver of the Note's balloon payment renders it irrelevant, the CTA did not fall within the scope of the statute of frauds, and PNC's predecessor subscribed the CTA in compliance with the statute of frauds. Finally, the Richardsons pled suppression on the part of PNC with sufficient particularity. PNC's motion to dismiss is DENIED as to Counts II and III.

A separate order will be entered consistent with this opinion.

Done this 18th day of September, 2015.

United States Bankruptcy Judge

c: Charles M. Ingrum Jr., Attorney for Plaintiffs

  John D. Collins, Attorney for Defendant

28